UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

HUBERT VAN GENT,                    )
                                    )
          Plaintiff,                )
                                    )
     v.                             )    Case No. 4:08CV959 FRB
                                    )
SAINT LOUIS COUNTRY CLUB,           )
et al.,                             )
                                    )
          Defendants.               )

**MEMORANDUM AND ORDER**

          Presently before the Court is Defendants' Motion For
Summary Judgment (Docket No. 143), filed by defendants St. Louis
Country Club ("SLCC" or "Club"), David Q. Wells, Stephen D. Lilly,
and James M. Snowden.   All matters are pending before the
undersigned United States Magistrate Judge, with consent of the
parties, pursuant to 28 U.S.C. § 636(c).

## I.    Factual Background

          Unless otherwise specified, the following facts are
undisputed.   Plaintiff Hubert Van Gent ("plaintiff") began his
employment with SLCC in 1976 as a maitre'd.   In 1984, he was
elevated to the position of SLCC's General Manager, a position he
held until he resigned in May of 2007.

          During his tenure as General Manager of SLCC, plaintiff
was one of the highest paid employees of SLCC, and had the
authority to hire and fire all non-sports related employees of
SLCC. Plaintiff routinely made recommendations regarding salaries,

- 1 -

bonuses, and deferred contribution amounts for SLCC employees, including himself. Between 1984 and 2007, while plaintiff was General Manager of SLCC, there were between 250 and 300 full and part-time employees, and an average of 40-50 full-time employees.

A.    The Employment Agreement Plan

On July 1, 1984, following plaintiff's elevation to General Manager, he and SLCC entered into an Employment Agreement. (Administrative Record ("A.R.") 0001).[1]  Plaintiff negotiated with SLCC for the inclusion of a deferred compensation plan as part of that agreement, which the parties refer to as the "Employment Agreement Plan."[2]  The Employment Agreement Plan required the Club to credit a portion of plaintiff's salary to a bookkeeping reserve. (A.R. 0002).  Plaintiff negotiated with SLCC for the ability to suggest investments for the Employment Agreement Plan because he felt it was his money.  The parties agree that plaintiff requested that his account be managed by defendant William Simpson, a broker, but plaintiff claims that Simpson mismanaged his account since its inception.  For twenty years, plaintiff received account statements.  Plaintiff alleges that the Employment Agreement does not provide that SLCC is required to follow plaintiff's investment

_____

[1]The Administrative Record, spanning more than 2,500 pages, has been filed by defendants under seal.  (Docket Nos. 101-128).

[2]A deferred compensation plan "is an agreement by the employer to pay compensation to employees at a future date.  The main purpose of the plan is to defer the payment of taxes." In re IT Group, Inc., 448 F.3d 661, 664 (3rd Cir. 2006) (quoting David J. Cartano, Taxation of Compensation & Benefits § 20.01, at 709 (2004)).

suggestions, and that he in fact suggested very few investments over the years.

The Employment Agreement contained numerous provisions regarding the Employment Agreement Plan. These included the manner in which the Club was to credit and debit plaintiff's account, plaintiff's right to designate a beneficiary or beneficiaries, the timing and manner in which the funds would be distributed to plaintiff or to his beneficiary or beneficiaries following plaintiff's termination of service, plaintiff's right to suggest investments for his account, a provision that the Club had no duty to fund its obligations under the agreement, the assets from which payments would be made under the agreement, and the statement that a person's rights to receive payments from the Club under the Employment Agreement Plan shall be no greater than the rights of an unsecured creditor of the Club. (A.R. 0002-0005).

The parties dispute whether they intended for a fiduciary relationship to be created as a result of the Employment Agreement Plan. While defendants contend that the Employment Agreement specifically provided that no fiduciary relationship was created, plaintiff denies that he lacked intent for a fiduciary relationship to be created. The parties also dispute whether the Employment Agreement Plan is a "top hat" plan under the Employee Retirement Income Security Act, 29 U.S.C. § 1001 et seq. ("ERISA").[3]

---

[3]As will be discussed in detail, infra, a top hat plan is a plan that is unfunded, used by employers to provide "deferred compensation for a select group of management or highly compensated employees," and exempted from certain ERISA

Defendants claim that the Employment Agreement Plan is a top hat plan, while plaintiff contends that it is not. Plaintiff also contends that the Employment Agreement Plan is not an ERISA plan, which defendants dispute.

B. The Deferred Compensation Plan

On or about February 1, 1990, the Club executed the St. Louis Country Club Deferred Compensation Plan ("Deferred Compensation Plan"), which provided for retirement benefits, death benefits, and hardship benefits for plaintiff and other Club employee participants. (A.R. 0006-0018). The parties dispute whether the Deferred Compensation Plan is a top hat plan under ERISA, with defendants arguing in the affirmative and plaintiff arguing in the negative. Defendants contend that plaintiff admitted during his deposition that the Deferred Compensation Plan was a top hat plan, but plaintiff maintains that, while he did so state during his deposition, his testimony is not dispositive of the issue.

On August 23, 2007, the Club filed a Top-Hat Plan Registration Statement with the United States Department of Labor for both the Deferred Compensation Plan and the Employment Agreement Plan, stating that both were plans "maintained for a select group of management or highly compensated employees." (A.R. 67-68).

_____

requirements that are relevant to plaintiff's claims in the case at bar. 29 U.S.C. §§ 1051(2), 1081(a)(3), 1101(a); see also Emenegger v. Bull Moose Tube Co., 197 F.3d 929, 932 n. 6 (8th Cir. 1999)(internal citations omitted).

The parties agree that the Employment Agreement Plan specifically provided that:

> as a condition to the receipt of benefits hereunder, each participant, upon severance of employment with the Club, shall execute an agreement with the Club whereby, in consideration of the receipt of such benefits, such Participant agrees not to become employed with any private club within a one hundred mile radius of the Club for a period of two years following termination of employment with the Club.

(A.R. 0015).

The parties agree that plaintiff never executed a non-compete agreement. SLCC nevertheless attempted to distribute benefits to plaintiff. Plaintiff admits this, but disputes the source of the funds, alleging that the funds from the Employment Agreement Plan and the Deferred Compensation Plan have been commingled in different accounts to the extent that it is now unclear what funds belong in what accounts. The parties also dispute whether the money distributed to plaintiff represented all he would have been entitled to had he signed a non-compete agreement, with plaintiff maintaining that the Employment Agreement Plan was mismanaged. The parties dispute whether failure to execute a non-compete agreement amounts to forfeiture of benefits under the Deferred Compensation Plan. Defendants claim in the affirmative, while plaintiff claims that he did not forfeit benefits because he abided by the terms of the non-compete agreement.

C.    The Accounts

Shortly after the Employment Agreement was created, SLCC opened, at plaintiff's request, an account with A.G. Edwards & Sons, Inc. (although later known as Wachovia Securities, LLC and now known as Wells Fargo Advisors, LLC, the parties refer to the account that was created as the "A.G. Edwards Account").  At that time, plaintiff understood that Employment Agreement Plan contributions would be deposited and maintained therein and managed by defendant William Simpson, a broker.  The parties dispute the extent to which plaintiff was permitted to suggest investments, with defendants claiming that plaintiff did so regularly and plaintiff claiming that he did so rarely.  Plaintiff maintains that Simpson mismanaged the investments in the A.G. Edwards account from its inception.  Plaintiff does not dispute that he was regularly provided with account statements.  The parties dispute whether the A.G. Edwards account qualified as the Employment Agreement Plan's "bookkeeping reserve."  While the parties agree that SLCC's audited financial statements did not reflect the money related to the Employment Agreement Plan until the 1999 audited financial statements were prepared, they dispute the time at which plaintiff became aware of this.

SLCC also opened an account at Bank of America to hold plaintiff's contributions to the Deferred Compensation Plan.  In 2005, with plaintiff's knowledge, SLCC transferred the A.G. Edwards account and several others to Fidelity Investments.  Plaintiff alleges that the Bank of America account was also transferred to

Fidelity. Plaintiff alleges that the A.G. Edwards account and funds from other accounts were transferred into Fidelity Account 601, thereby consolidating the Deferred Compensation Plan funds with the Employment Agreement Plan funds. Plaintiff also alleges that SLCC subsequently opened Fidelity Account 827 and transferred to it part of the Employment Agreement Plan funds and other funds. The parties cannot agree which Fidelity Investment accounts hold the funds for which plan. Defendants use two names to refer to the account which they maintain holds the entirety of the Employment Agreement Plan funds: the Fidelity EAP Account and Fidelity Account Z71-68XXX. Defendants maintain that all plaintiff is entitled to under the Deferred Compensation Plan is the amount SLCC attempted to distribute in May of 2009, but plaintiff alleges that defendants failed to keep the Employment Agreement Plan funds separate from the Deferred Compensation Plan funds, and instead wrongfully commingled them. Plaintiff also alleges that the value of the accounts should be higher, appearing to challenge the investment strategy used.

The parties agree that plaintiff informed SLCC's human resource director that there were problems with the Employment Agreement account and that, in January of 2005, SLCC's President initiated an investigation of the Employment Agreement account. The parties dispute what amounts should have been credited to a bookkeeping reserve, and dispute the nature of two withdrawals, one in the amount of $28,678.68 in May of 2009 and another in the amount of $14,024.27 in May of 2010: plaintiff suggests impropriety

while defendants claim the withdrawals were to pay taxes on the attempted distributions, citing to pages in the administrative record that show pay stubs from the attempted distributions SLCC made to plaintiff reflecting taxes paid totaling those amounts. Plaintiff alleges, and defendants admit, that as of August of 2011 the value of Fidelity Account 827 was $383,889.50.

D.  Plaintiff's Resignation

The parties dispute the manner in which plaintiff's employment at SLCC ended. While defendants contend that plaintiff resigned voluntarily, plaintiff contends that his resignation was due to several factors connected to the plans at issue in this lawsuit, and characterizes his departure from SLCC as a "constructive discharge." In support, plaintiff contends that SLCC failed to investigate Mr. Simpson's "clear mishandling" of plaintiff's Employment Agreement Plan. Plaintiff contends that he repeatedly inquired regarding the Employment Agreement Plan, and eventually stated that he did not want to work for people who were stealing from him. Plaintiff contends that, during a finance committee meeting in February of 2007, he was asked about tendering his resignation. Plaintiff admits that his resignation letter fails to mention any intolerable work conditions or adverse circumstances causing his resignation. Plaintiff admits that the only relevant conversation he had with a member of SLCC's Board of Governors was with Fred Hanser who invited plaintiff to continue to work at SLCC, but plaintiff claims the invitation was not genuine. Plaintiff admits that SLCC advised him that benefits would commence

within 60 days of his resignation, provided that he execute a non-compete agreement, and that he did not execute such an agreement. Defendants assert that plaintiff admitted during his deposition that he resigned because he wished to file a lawsuit, and he was concerned that the statute of limitations would soon expire.

E.    SLCC's Attempted Distributions

SLCC contends that, in May of 2009, after the expiration of the two-year non-compete period, it attempted to distribute benefits in the amount of $31,714.90 under the Deferred Compensation Plan. Plaintiff disputes that these funds constituted benefits from his Deferred Compensation Plan because the funds from the two plans had been commingled since 2005. Plaintiff does admit that the timing of SLCC's attempted distribution in May of 2009 was proper.

While SLCC makes several allegations regarding the balances of the Fidelity Accounts representing the Employment Agreement Plan funds and the Deferred Compensation Plan funds, plaintiff contends that, because the funds are commingled, neither Fidelity Account can properly be referenced as an Employment Agreement Plan account or a Deferred Compensation Plan account. Plaintiff disputes that the amounts distributed to him represented all benefits he would have been due had he signed the non-compete agreement. Plaintiff has returned all attempted distributions. Plaintiff paid no income tax on his contributions to the Employment Agreement Plan in the years the contributions were made.

The parties dispute plaintiff's level of knowledge about

deferred compensation and the funding of ERISA top hat plans at the time he entered into the Employment Agreement. Plaintiff admits that he stated, during his deposition, that the Deferred Compensation Plan was a top hat plan under ERISA, but denies that he was qualified to draw a legal conclusion to that effect.

## II.    Procedural History

Plaintiff filed his original complaint on July 1, 2008, alleging various claims arising under ERISA and state law. Before responsive pleadings were filed, plaintiff filed a First Amended Complaint on October 6, 2008, again alleging claims pursuant to ERISA and state law. Upon the motion of defendants, several counts of plaintiff's First Amended Complaint were dismissed on various grounds, including ERISA preemption. In addition, a motion to compel arbitration, filed by former party-defendants A.G. Edwards & Sons, Inc., Wachovia Securities, L.L.C., and William Simpson, Jr., was granted.

On December 2, 2010, plaintiff sought and was given leave to file a Second Amended Complaint. On December 22, 2010, plaintiff filed a nine-count Second Amended Complaint. Counts I through VIII alleged claims pursuant to ERISA. Count IX alleged civil conspiracy against eight individual defendants. These eight individual defendants were named only in Count IX.

On April 4, 2011, the eight individual defendants filed a motion to dismiss Count IX, arguing that the civil conspiracy cause of action plaintiff asserted therein was preempted by ERISA. In his responsive pleading, plaintiff stated that he intended to

withdraw Count IX, and stated that he also intended to seek leave of court to file a third amended complaint. When ordered by this Court to respond to the substantive arguments presented by the individual defendants in their motion to dismiss Count IX, plaintiff, on October 12, 2011, filed a response stating that, while he intended to withdraw Count IX, the claims therein were not preempted by ERISA because they were only tangentially related to the administration of the Plans at issue, and because the actions detailed in Count IX caused harm separate from the claims alleged in the Second Amended Complaint's ERISA counts. At no time did plaintiff argue that the Employment Agreement Plan was not governed by ERISA. In fact, throughout this litigation, plaintiff has proceeded under the theory that the Employment Agreement Plan and the Deferred Compensation Plan were governed by ERISA. Based upon the submissions and representations of the parties, this Court granted the individual defendants' motion to dismiss Count IX on October 12, 2011.

In January of 2012, plaintiff filed a motion for permission to obtain discovery which, following stipulation between the parties, was granted as to the following issues: whether the plans were top hat plans under ERISA, the manner in which plaintiff's employment relation with SLCC ended, and the transfer of funds between and among certain accounts related to the two plans at issue.

On May 4, 2012, the defendants filed motions for summary judgment. When counsel of record for plaintiff at that time failed

to timely respond, this Court entered an order giving counsel until July 23, 2012 to do so. On that date, plaintiff, proceeding pro se, filed a motion for an extension of time due to counsel's negligence. A hearing was subsequently held, during which plaintiff's counsel indicated his intent to file responses to the motions for summary judgment, and this Court entered an order granting counsel until August 10, 2012, to do so. On that date, counsel filed a memorandum, stating that illness prevented him from complying with the Court's order, and stating his intent to withdraw as counsel for plaintiff. This Court entered an order granting plaintiff until September 14, 2012, to respond to the motions for summary judgment either pro se or through new counsel. The following day, present counsel entered an appearance on plaintiff's behalf, and thereafter filed responses to the motions for summary judgment.

In the Second Amended Complaint, plaintiff alleges that "[t]he deferred compensation portion of the Employment Agreement is an 'employee pension benefit plan' or 'pension plan' as defined pursuant to ERISA Section 3(2)(A)(i) and (ii)" or § 1002(2). (Docket No. 61 at 20). Plaintiff also alleges that he lacked "knowledge and expertise in the structure and characteristics of employee benefit plans," and that the parties had "unequal bargaining power." (Id. at 21). Plaintiff alleges that SLCC, as Plan Administrator, failed to follow various required administrative procedures. (Id. at 21-24).

In the Second Amended Complaint, plaintiff alleges that

SLCC established an investment account at A.G. Edwards in 1984 for the purpose of funding the Employment Agreement Plan. Plaintiff alleges that this account was liquidated in September of 2005 and transferred to a Fidelity Investments account representing the Deferred Compensation Plan's Trust account, account number Z83-296503. Plaintiff alleges that, in late 2005 and early 2006, SLCC consolidated all of plaintiff's deferred compensation accounts into a single Fidelity Investments account, account number Z83-976601 ("Fidelity account 601"). Plaintiff alleges that in May of 2007, SLCC separated Fidelity account 601 into two separate Fidelity accounts: Fidelity Account 601 and a second Fidelity Account bearing account number Z71-68827 ("Fidelity Account 827").

Plaintiff alleges that Fidelity Account 601 represented the Employment Agreement Plan, while Fidelity Account 827 represented the Deferred Compensation Plan. Plaintiff alleges that SLCC, by and through its directors and officers, wrongfully transferred funds between and among Fidelity Accounts 601 and 827 such that funds were commingled, and Fidelity Account 601's value dropped significantly while Fidelity Account 827's value increased significantly. Plaintiff alleges that, in May of 2009, SLCC, by and through its directors and officers, removed $30,000.00 from Fidelity Account 827 and closed Fidelity account 601, leaving approximately $60,000.00 unaccounted for. Plaintiff also alleges that, in April of 2010, SLCC, by and through its directors and officers, removed approximately $14,000.00 from Fidelity Account 827. The parties dispute which Fidelity Account represents the

funds for which plan.

In Counts I and II of the Second Amended Complaint, plaintiff seeks benefits under the Deferred Compensation Plan and the Employment Agreement Plan, respectively, pursuant to 29 U.S.C. § 1132(a)(1)(B). In Counts III through VI, plaintiff proceeds under the civil enforcement section of ERISA, 29 U.S.C. § 1132(a)(2), which allows a participant to bring a civil action for relief under 29 U.S.C. § 1109 for breach of fiduciary duty.

In Count VII, citing 29 U.S.C. § 1140, plaintiff alleges that SLCC, Snowden, Lilly and Wells interfered with his protected rights under ERISA. In support, plaintiff alleges that the defendants discriminated against him in retaliation for his assertion of his ERISA rights pertaining to the Employment Agreement Plan. Plaintiff alleges that this discrimination took the form of constructive discharge from his position at SLCC, and defendants' failure and refusal to: (1) release certain benefits; (2) provide plaintiff with requested documents and availability of people with information useful to plaintiff; and (3) make timely benefit payments under both plans. In Count VIII plaintiff, proceeding against SLCC, alleges that SLCC, the Plan Administrator, failed to provide information under 29 U.S.C. § 1024. Plaintiff alleges that SLCC did not provide him with copies of the Summary Plan Description or other documents related to the Employment Agreement Plan or the Deferred Compensation Plan.

### III.  Discussion

Pursuant to Fed. R. Civ. P. 56(c), a court may grant

summary judgment if the information before it shows that there are no material issues of fact in dispute, and that the moving party is entitled to judgment as a matter of law. <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 247 (1986). The moving party bears the burden of proof to set forth the basis of its motion, <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323 (1986), and the court must view all facts and inferences in the light most favorable to the non-moving party, <u>Matsushita Elec. Indus. Co. v. Zenith Radio</u>, 475 U.S. 574, 587 (1986).

Once the moving party shows there are no material issues of fact in dispute, the burden shifts to the adverse party to set forth facts showing there is a genuine issue for trial. <u>Id.</u> The non-moving party may not rest upon his pleadings, but must come forward with affidavits or other admissible evidence to rebut the motion. <u>Celotex</u>, 477 U.S. at 324. Summary judgment is a harsh remedy and should not be granted unless the movant "has established [its] right to judgment with such clarity as to leave no room for controversy." <u>New England Mutual Life Ins. Co. v. Null</u>, 554 F.2d 896, 901 (8th Cir. 1977).

29 U.S.C. § 1132(a)(2) permits a participant to bring a civil action for appropriate relief under 29 U.S.C. § 1109. It is undisputed that plaintiff is a participant. "It is well settled, moreover, that suit under § 1132(a)(2) is 'brought in a representative capacity on behalf of the plan as a whole' and that remedies under § 1109 'protect the entire plan.' <u>Braden v. Wal-Mart Stores, Inc.</u>, 588 F.3d 585, 593 (8th Cir. 2009) (quoting <u>Mass.</u>

Mut. Life Ins. Co. v. Russell, 473 U.S. 134, 142 & n. 9 (1985);
LaRue v. DeWolff, Boberg & Assocs., 552 U.S. 248, 256 (2008) (§
1132(a)(2) "does not provide a remedy for individual injuries
distinct from plan injuries.")).

In the instant motion, defendants argue that they are
entitled to judgment as a matter of law on plaintiff's claim in
Count I because plaintiff forfeited his right to receive benefits
from the Deferred Compensation Plan when he failed to execute a
non-compete agreement.  Regarding Count II, defendants ask that
judgment be entered directing SLCC to pay benefits to plaintiff
equal to the contents of Fidelity Account No. Z71-68XXXX[4] less
applicable withholdings on the date of judgment.

Regarding Counts III through VI, defendants argue that
they are entitled to judgment in their favor as a matter of law
because both the Employment Agreement Plan and the Deferred
Compensation Plan were top hat plans under ERISA, and are therefore
exempted from the ERISA fiduciary provisions upon which plaintiff's
claims rest.  Regarding Count VII, defendants argue that they are
entitled to judgment as a matter of law because plaintiff
voluntarily resigned his employment with SLCC.  Regarding Count
VIII, defendants argue that they are entitled to judgment as a
matter of law because SLCC satisfied the reporting requirements for
top hat plans.  In response, plaintiff claims that neither plan is
a top hat plan.

---

[4]Defendants state that they are excluding the last four
digits of this account number for privacy reasons.

A.   Top Hat Plans

        Defendants claim that both the Employment Agreement Plan
and the Deferred Compensation Plan are top hat plans under ERISA.
Defendants argue that, because plaintiff's claims in Counts III
through VI and Count VIII arise under substantive ERISA provisions
from which top hat plans are exempted, defendants are entitled to
judgment as a matter of law on those claims. In response, plaintiff
argues that neither plan is a top hat plan.

        A top hat plan is a plan that is unfunded, and used by
employers to provide "deferred compensation for a select group of
management or highly compensated employees."  29 U.S.C. §§ 1051;
see also Emenegger v. Bull Moose Tube Co., 197 F.3d 929, 932 n. 6
(8th Cir. 1999).  "Top hat plans are almost completely exempt from
'ERISA's substantive requirements.'"  Simpson v. Mead Corp., 187
Fed.Appx. 481, 483-84 (6th Cir. 2006) (quoting Senior Executive
Benefit Plan Participants v. New Valley Corp. (In re New Valley
Corp.), 89 F.3d 143, 148 (3rd Cir. 1996)); see also Emenegger, 197
F.3d at 932 n. 6 (citing 29 U.S.C. §§ 1051(2) (participation and
vesting),   1081(a)(3)   (funding),   1101(a)   (fiduciary
responsibility)).  This is so because Congress recognized that
"certain individuals, by virtue of their position or compensation
level, have the ability to affect or substantially influence,
through negotiation or otherwise, the design and operation of their
deferred compensation plan, taking into consideration any risks
attendant thereto, and therefore, would not need the substantive
rights and protection of Title 1." DEPARTMENT OF LABOR, OFFICE OF PENSION

AND WELFARE BENEFIT PROGRAMS, OPINION 90-14A, 1990 WL 123933 at *1 (May 8, 1990).

More specific to the case at bar, under 29 U.S.C. § 1101(a)(1), "top hat plans are exempted from 'ERISA's fiduciary responsibility provisions, including the requirement of a written plan, the need to give control of plan funds to a trustee, the imposition of liability on fiduciaries, and limitations on transactions and investments.'" Simpson, 187 Fed.Appx. at 484 (quoting In re New Valley Corp., 89 F.3d at 148). When Congress exempts a plan from ERISA's fiduciary duty requirements, as it did with top hat plans, plaintiffs may not use state law to put back in what Congress has taken out. See Pilot Life Ins. Co., 481 U.S. at 54. Even if the facts of a given case make "an ERISA action [unavailable] against particular defendants, the relief provided by ERISA is the only relief available." Smith v. Provident Bank, 170 F.3d 609, 615 (6th Cir. 1999).

Regarding ERISA's part 1 reporting and disclosure requirements, while top hat plans are not exempted, ERISA authorizes the Secretary of Labor to promulgate alternative methods for satisfying these requirements. 29 U.S.C. § 1030. The Secretary's regulations provide that a top hat plan will not be subject to ERISA's reporting and disclosure requirements if the employer files a statement with the Secretary of Labor describing the plan as a top hat plan. 29 C.F.R. § 2520.104-23(b); see also Miller v. Pharmacia Corporation, 2005 WL 1661500 at *4 (E.D. Mo. 2005).

1.   ERISA Plan Status

In order for a plan to be considered a top hat plan, it must be an ERISA plan in the first instance.  Emenegger, 197 F.3d at 932 n. 6.  In the case at bar, the parties do not dispute, and the undisputed facts establish, that the Deferred Compensation Plan is an employee pension benefit plan under ERISA, 29 U.S.C. § § 1002(2)(A).

The parties do, however, dispute whether the Employment Agreement Plan is an ERISA plan.  Plaintiff would have this Court resolve that question in the negative based upon Dakota, Minnesota & Eastern R.R. Corp. v. Schieffer, 648 F.3d 935 (8th Cir. 2010), in which the Eighth Circuit decided that a one-person employment contract providing for severance benefits was not an "employee welfare benefit plan" under ERISA, 29 U.S.C. § 1002(1).  Plaintiff raised this same argument in a previously-filed motion for leave to file a third amended complaint.  As this Court explained in detail in its Memorandum and Order denying such relief, Schieffer is inapplicable to the case at bar.

In Schieffer, the Court analyzed only a contract offering a severance benefit under the definition of an "employee welfare benefit plan," 29 U.S.C. § 1002(1).  The Court expressly limited its holding to employee welfare benefit plans offering severance benefits.  Schieffer is inapplicable to the case at bar, which involves disputes over two employee pension benefit plans offering pension benefits.  Courts analyze employee welfare benefit plans offering severance benefits differently than employee pension

benefit plans offering pension benefits.  See Fort Halifax Packing Co. v. Coyne, 482 U.S. 1, 7 n. 5 (1987) (addressing the uncertainty of the ERISA status of such plans given the lack of an ongoing administrative scheme, and explaining how severance benefits come within the definition of an employee welfare benefit plan).  Other courts have rejected the argument that case law involving employee welfare benefit plans offering benefits applies equally to cases involving employee pension benefit plans offering pension benefits. See Robbins v. Friedman Agency, Inc., 760 F. Supp. 2d 564, 567 (E.D. Va. 2010) (rejecting the argument that Fort Halifax should be applied to decide that the single-participant deferred compensation portion of an employment agreement was not an ERISA pension benefit plan, noting that Fort Halifax was "inapposite here, where there is no dispute over severance benefits.")  Plaintiff's argument, based upon Schieffer, that the Employment Agreement Plan was not an employee pension benefit plan under ERISA is not well taken.  The Employment Agreement Plan is an employee pension benefit plan under ERISA.

Having determined that both the Deferred Compensation Plan and the Employment Agreement Plan are ERISA plans as defined in 29 U.S.C. § 1002(1)(A), the undersigned addresses the issue of whether they are top hat plans as defined by ERISA.

(a).  Select Group of Management or Highly Compensated Employees

Considering the second requirement first, there can be no doubt, for purposes of both the Employment Agreement Plan and the

- 20 -

Deferred Compensation Plan, that both plans were used by SLCC to provide deferred compensation to a select group of management or a highly compensated employees. While ERISA provides no bright line test for determining whether a participant qualifies as a member of a "select group of management or highly compensated employees," courts examining this issue have considered qualitative and quantitative factors such as the percentage of the workforce participating in the plan, the participant's job duties, and sometimes whether the participant had bargaining power over the plan's terms. See Alexander v. Brigham and Women's Physician Org., Inc., 513 F.3d 37, 43-47 (1st Cir. 2008).

The evidence of record establishes, and the parties do not dispute, that "[t]he Deferred Compensation Plan was offered to a limited number of highly compensated employees." (Docket No. 194 at 3, ¶ 7); see also (Docket No. 186, Attachment 1) (Declaration Of Maxine Munzert In Support Of Defendants' Motion For Summary Judgment). The parties do not dispute that, during the relevant time period, SLCC employed between 250 and 300 full and part-time employees, and an average of 40-50 full time employees. The parties do not dispute that no more than six SLCC employees participated in the Deferred Compensation Plan in any one year, a very small percentage of SLCC's workforce. The parties do not dispute that the employees who participated in the Deferred Compensation Plan held key positions in SLCC management, including the Clubhouse Manager, the Golf Course (Greens) Superintendent, the Maintenance Superintendent, the Controller/Comptroller, the

Executive Chef, the Locker Room Manager, and plaintiff himself, the General Manager. The undersigned therefore concludes that the Deferred Compensation Plan meets the second requirement necessary for classification as a top hat plan under ERISA. See Alexander, 513 F.3d at 43-47 (to determine whether a plan meets the second requirement, courts examine the percent of the workforce participating in the plan, the participant's job duties, and whether the plan participant possessed bargaining power over the plan terms).

Applying those same standards to the Employment Agreement Plan, the undersigned concludes that it too meets the second requirement. Regarding quantitative factors, while other highly compensated members of SLCC management were offered employment contracts with deferred compensation provisions that were substantially similar to plaintiff's, the parties do not dispute that plaintiff was the only participant in the Employment Agreement Plan. It therefore cannot be said that the Employment Agreement Plan was not offered only to a select group. Regarding qualitative factors, the parties do not dispute that plaintiff, as General Manager, was the highest ranking employee of SLCC and as such, was able to make recommendations regarding the various compensation provided to other employees, employee programs, and operational guidelines, and had the authority to hire and fire non sports-related employees. The fact that plaintiff's duties evolved such that they were greater at the end of his long tenure as General Manager than they were at the beginning do not change the

conclusion that plaintiff's job duties were commensurate with a high-ranking management employee. The parties also agree that plaintiff was one of the highest paid employees at SLCC. Finally, plaintiff undisputedly possessed bargaining power over the terms of the Employment Agreement Plan. As plaintiff alleges in his Second Amended Complaint, he negotiated with SLCC for inclusion of a deferred compensation agreement in his Employment Agreement, selected the size of his contributions, sought to modify the agreement concerning the payment of taxes, and had the ability to suggest investments. While plaintiff contends that he did not have such power when he first became General Manager, and while plaintiff attempts to portray himself as unsophisticated regarding deferred compensation in general, the parties do not dispute that plaintiff negotiated the amount of compensation he would defer, his ability to suggest investments, and the tax status of the amounts he deferred. This shows that plaintiff possessed bargaining power. Based upon the foregoing, the undersigned determines that the Employment Agreement Plan meets the second requirement for classification as a top hat plan under ERISA. See Alexander, 513 F.3d at 43-47 (to determine whether a plan meets the second requirement, courts examine the percent of the workforce participating in the plan, the participant's job duties, and whether the plan participant possessed bargaining power over the plan terms).

    (b). Unfunded

    In order to be properly classified as a top hat plan

under ERISA, a plan must be unfunded. 29 U.S.C. §§ 1051(2). ERISA does not define what makes a plan unfunded for the purpose of determining whether it qualifies as a top hat plan, but case law provides guidance. The Eighth Circuit's seminal decision in Dependahl v. Falstaff Brewing Corp., 653 F.2d 1208 (8th Cir. 1981) is particularly instructive.

In Dependahl, the Falstaff Brewing Corporation instituted, in the form of a whole life insurance plan, a death benefits plan for approximately a dozen of its higher-ranking executives. Id. at 1213-14. The plan was specifically a death benefits plan, and the death of a covered executive triggered both the insurance company's obligation to pay, and the plan's obligation to pay. Id. The plan provided that the covered executive's beneficiaries would receive annuity income benefits, and Falstaff would recover the annual premiums it had previously paid, with interest. Id.

The district court concluded that the plan was funded. Dependahl v. Falstaff Brewing Corp., 491 F.Supp. 1188, 1195 (E.D. Mo. 1980)(aff'd in relevant part, 653 F.2d 1208). In reaching that conclusion, the district court reasoned that a plan would be considered funded if benefits were to be paid through a specific insurance policy, as it was in that case, and unfunded if benefits were paid from the employer's general assets. Id. On appeal, the Eighth Circuit affirmed the district court, concluding that:

> **Funding implies the existence of a *res* separate from the ordinary assets of the corporation.** All whole-life insurance

> policies which have a cash value with premiums
> paid in part by corporate contributions to an
> insurance firm are funded plans.  The employee
> may look to a *res* separate from the
> corporation in the event the contingency
> occurs which triggers the liability of the
> plan.

*Dependahl*, 653 F.2d at 1214 (emphasis added).

In contrast to *Dependahl*, the Eighth Circuit later analyzed a case which also involved the purchase of a life insurance policy in *Belsky v. First Nat. Life Ins. Co.*, 818 F.2d 661 (8th Cir. 1987).  There, the employer instituted a salary continuance agreement with the intent of providing retirement, disability and death benefits to covered employees.  *Id.* at 663. To cover the cost of providing the benefits, the employer bought a life insurance policy that would accrue a cash surrender value that the employer could use to pay benefits under the plan.  *Id.*  Unlike *Dependahl*, the employer was the owner and beneficiary under the policy, and the language of the plan did not directly tie the policy to the plan.  *Id.*  In addition, the *Belsky* plan provided not only for death benefits, but for retirement and disability benefits.  *Belsky*, 818 F.3d at 663.  In concluding that the plan was unfunded, the Eighth Circuit found these to be significant factors, and also found it significant that the plan expressly provided that:

> the rights of the Executive or any beneficiary
> of the Executive shall be solely those of an
> unsecured creditor of the Bank.  If the Bank
> shall acquire an insurance policy or any other
> asset in connection with the liabilities
> assumed by it hereunder, then, except as

> otherwise provided, such policy or other asset
> shall not be deemed to be held under any trust
> for the benefit of the Executive or his/her
> beneficiary or to be collateral security for
> the performance of the obligations of the
> Bank, but shall be, and remain, a general
> unpledged, unrestricted asset of the Bank.

Id. at 663. A plan is "funded when benefits are paid through a specific insurance policy and unfunded when they are paid from the employer's general assets." Id. (citing Dependahl, 491 F.Supp. at 1195, aff'd in relevant part, 653 F.2d 1208).

In Northwestern Mutual Life Insurance Co. v. Resolution Trust Corp., 848 F.Supp. 1515 (N.D. Ala. 1994), the employer purchased life insurance policies to recoup its costs of paying retirement benefits. Addressing the issue of whether insurance policies purchased by the employer in conjunction with a deferred compensation plan resulted in the plan being classified as funded, the Northwestern court wrote: "[t]he essential feature of a funded plan is that its assets are segregated from the general assets of the employer and are not available to general creditors if the employer becomes insolvent." Id. at 1517.

Another factor of some relevance to this inquiry is whether the participants paid income taxes on the deferred compensation amounts in the years they deferred the income. A "plan is more likely than not to be regarded as unfunded if the beneficiaries under the plan do not incur tax liability during the year that the contributions to the plan are made." Miller v. Heller, 915 F.Supp. 651, 659 (S.D. N.Y. 1996)(analyzing Dependahl

and <u>Belsky</u>, <u>et</u> <u>al.</u>, in addressing whether a plan was unfunded for purposes of determining whether it qualified as a top hat plan under ERISA). Based upon <u>Dependahl</u> and <u>Belsky</u>, the <u>Miller</u> court concluded that courts considering this issue must ask: "can the beneficiary establish, through the plan documents, a legal right any greater than that of an unsecured creditor to a specific set of funds from which the employer is, under the terms of the plan, obligated to pay the deferred compensation?" <u>Id.</u> at 660.

(<u>i</u>). <u>The Employment Agreement Plan</u>

Having examined the Employment Agreement Plan, and having considered the arguments of the parties in light of the foregoing guiding principles, the undersigned determines that the Employment Agreement Plan is unfunded. As in <u>Belsky</u>, the Employment Agreement did not provide plaintiff with any rights to a specific res that was separate from SLCC's general assets. In fact, the Employment Agreement specifically provided that plaintiff's rights were no greater than those of an unsecured creditor of SLCC, and that the funds could be used to satisfy SLCC's creditors, if necessary. The Employment Agreement provides that SLCC:

> shall be under no duty to fund its obligations
> under this Agreement. All payments hereunder
> shall be made from the general assets of the
> Club. Any assets which may be acquired by the
> Club in anticipation of its obligations
> hereunder shall be part of the general funds
> of the Club and no person other than the Club
> shall, by virtue of any provisions of this
> Agreement, have an interest in such assets.
> To the extent that any person acquires a right
> to receive payments from the Club under this
> Agreement, such right shall be no greater than
> the right of an unsecured general creditor of

the Club.

(A.R. 0003-0004).

The undersigned finds this language particularly significant in determining that the Employment Agreement Plan was unfunded. See Belsky, 818 F.2d at 663-64 (in determining that the plan was unfunded, it was "particularly significant" that the plan language provided that the rights of the executive would be "solely those of an unsecured creditor.") In addition, plaintiff admits that, when he signed the Employment Agreement, SLCC's President and Controller discussed with plaintiff the fact that his contributions to the Employment Agreement Plan would be subject to claims of SLCC's general creditors. (Docket No. 164 at 7-8). The Employment Agreement further provided that "[n]othing contained in this Agreement and no action taken pursuant to the provisions hereof shall create or be construed to create a trust of any kind, or a fiduciary relationship between the Club and Employee, or any other person." (A.R. 0004). Also of some significance is the fact that plaintiff did not pay income taxes on his contributions to the Employment Agreement Plan in the years the contributions were made. A "plan is more likely than not to be regarded as unfunded if the beneficiaries under the plan do not incur tax liability during the year that the contributions to the plan are made." Miller, 915 F.Supp. at 659.

Plaintiff cannot establish a legal right any greater than that of an unsecured creditor of SLCC to a specific set of funds

from which SLCC is, under the terms of the plan, obligated to pay the deferred compensation. <u>Dependahl</u>, 653 F.2d at 1214. For the foregoing reasons, the undersigned concludes that the Employment Agreement Plan was unfunded.

(<u>ii</u>). <u>The Deferred Compensation Plan</u>

In support of their argument that the Deferred Compensation Plan was a top hat plan, defendants contend that plaintiff admitted as much during his deposition. However, the determination of whether the Deferred Compensation Plan was a top hat plan is a question of law. While plaintiff's deposition testimony is relevant to what plaintiff believed the Deferred Compensation Plan to be, it is not dispositive of the legal issue of whether the Deferred Compensation Plan was a top hat plan under ERISA.

As discussed above, the Deferred Compensation Plan satisfies the second requirement to be considered a top hat plan, inasmuch as it was used by SLCC "primarily for the purpose of providing deferred compensation for a select group of management or highly compensated employees." 29 U.S.C. § 1051(2). This leaves the issue of whether the Deferred Compensation Plan was funded or unfunded.

Plaintiff contends that the Deferred Compensation Plan was funded because SLCC created a separate trust to hold funds that could be used to satisfy SLCC's obligation. However, as defendants contend in response, the fact that an employer maintains a trust in connection with a deferred compensation plan (commonly called a

"rabbi trust") will not undermine a plan's unfunded status. <u>In re</u> <u>IT Group, Inc.</u>, 448 F.3d 661, 670 n. 5 (3rd Cir. 2006) (citing DEPARTMENT OF LABOR, PENSION & WELFARE BENEFIT PROGRAMS, Opinion Letter 91-16A, 1991 ERISA LEXIS 16, at *6-7 (Apr. 5, 1991)).

In <u>In re IT Group, Inc.</u>, the Third Circuit determined that the plan at issue was unfunded even though the employer had established a trust in connection with the plan for the participants' benefit. 448 F.3d at 669-70. In reaching this conclusion, the Court noted that the documents associated with the plan evidenced the employer's obvious intent to create an unfunded plan. <u>Id.</u> at 669. The Court also noted that a "Questions and Answers" document circulated to potential participants along with the plan document explained that the trust created in association with the plan was a "Rabbi Trust" that "does not provide security in the event that IT Corporation or its subsidiaries become insolvent or file for bankruptcy," and the trust document stated that the trust assets were subject to creditors' claims in the event of insolvency. <u>Id.</u> at 669-70. Finally, the Court noted that the participants did not report their deferred amounts as income for tax purposes. <u>Id.</u> at 670.

In the case at bar, SLCC filed a Top-Hat Plan Registration Statement with the United States Department of Labor, describing it as a top hat plan. As plaintiff contends, SLCC's submission of the Registration Statement was untimely. However, the Registration Statement is evidence that SLCC intended for the Deferred Compensation Plan to be a top hat plan. Beyond SLCC's

intent, examination of the factors set forth above fully support the conclusion that the Deferred Compensation Plan was unfunded. First, plaintiff does not identify, nor is it apparent that, there exists a res separate from SLCC's general assets to which he could look to satisfy his claims.   See Dependahl, 653 F.2d at 1214 (funding implies a res separate from the employer's general assets to which participants can look to satisfy their claims).

Second, in his response to defendants' statement of material facts, plaintiff stated that SLCC sent him a letter concerning the Deferred Compensation Plan, and attached a copy of the letter as an exhibit to that document. (Docket No. 164, Attachment 1).   In that letter, as in the "Questions and Answers" document circulated to potential participants in In re IT Group, Inc., SLCC explains the nature of the trust established in connection with the Deferred Compensation Plan, and specifically:

> Under Federal tax laws, however, the assets in the trust must be available for creditors of the Club in the event it should become bankrupt or insolvent.   If the Plan did not provide for this contingency, you would be taxed each year on the amounts allocated to your account.   Under the current arrangement, contributions and earnings allocated to your account are not taxable; however, you, or your beneficiary in the event of your death, will be taxed on distributions when they are made from the Plan.

(Docket No. 164, Attachment 1, page 1).   As was the case in In re IT Group, Inc., this language provides further support for the conclusion that the Deferred Compensation Plan was unfunded. In re IT Group, Inc., 448 F.3d at 670 n. 5 (citing DEPARTMENT OF LABOR,

PENSION & WELFARE BENEFIT PROGRAMS, Opinion Letter 91-16A, 1991 ERISA LEXIS 16, at *6-7 (Apr. 5, 1991)(a "rabbi trust" maintained in connection with a deferred compensation plan will not undermine the plan's "unfunded" status).  Finally, plaintiff admits that he did not report the money he deferred under the Deferred Compensation Plan as income for tax purposes.  See <u>Miller</u>, 915 F.Supp. at 659 (a "plan is more likely than not to be regarded as unfunded if the beneficiaries under the plan do not incur tax liability during the year that the contributions to the plan are made").

Having determined that both the Employment Agreement Plan and the Deferred Compensation Plan are top hat plans under ERISA, the undersigned now addresses each count of plaintiff's Second Amended Complaint.

B.    <u>Counts I and II: Claims For Benefits Under 29 U.S.C. § 1132 (a)(1)(B)</u>

In Count I, plaintiff seeks to recover benefits due under the Deferred Compensation Plan.  In Count II, plaintiff seeks to recover benefits due under the Employment Agreement Plan.  SLCC is the only defendant named in Counts I and II.

In both Counts I and II, plaintiff proceeds under 29 U.S.C. § 1132(a)(1)(B), which authorizes a participant or beneficiary to bring a claim to recover benefits due under a plan. A plaintiff making a claim under § 1132(a)(1)(B) bears the burden of proving entitlement to plan benefits, <u>see Farley v. Benefit Trust Life Ins. Co.</u>, 979 F.2d 653, 658 (8th Cir. 1992), and his recovery is limited to benefits due under the relevant plan.  29

U.S.C. § 1132(a)(1)(B), <u>Kerr v. Charles F. Vatterott & Co.</u>, 184 F.3d 938, 943 (8th Cir. 1999). In the case at bar, the parties do not dispute that plaintiff is entitled to benefits under either plan.

      1.  <u>Count I</u>

Regarding Count I, SLCC first argues that it is entitled to judgment as a matter of law because plaintiff forfeited his right to benefits under the Deferred Compensation Plan when he failed to execute a non-compete agreement. In response, plaintiff argues that the plan did not require him to execute a non-compete agreement, and merely required him to refrain from becoming employed with another club located within a certain distance of SLCC for two years following the date of his resignation. SLCC alternatively argues that, even if plaintiff did not forfeit his right to benefits under the Deferred Compensation Plan, SLCC is entitled to judgment as a matter of law on Count I that the benefits due plaintiff under the Deferred Compensation Plan total $59,067.79, the amount of SLCC's attempted distribution in May of 2009. In support, SLCC argues that plaintiff admitted, during his deposition, that: (1) $59,067.79 was the amount he was entitled to receive under the Deferred Compensation Plan; and (2) the timing of the May 2009 attempted distribution was proper. In response, plaintiff contends that funds from his two accounts were not kept separate, and the funds SLCC attempted to distribute were the "wrong" funds. (Docket No. 163 at page 16).

The parties agree that plaintiff did not become employed by another club located within a certain distance of SLCC during the two years following his resignation from SLCC. By its own admission, SLCC attempted to distribute Deferred Compensation Plan benefits to plaintiff on May 30, 2009, after the two-year non-compete period ended. Therefore, SLCC's argument that plaintiff forfeited his right to receive benefits under the Deferred Compensation Plan because he failed to sign the non-compete agreement is not compelling.

However, SLCC's alternative argument is well taken. As SLCC asserts, on April 16, 2012, plaintiff testified that he did not dispute that the benefits he was entitled to receive from the Deferred Compensation Plan totaled $59,067.79. (Docket No. 145, Attachment 2, page 207). Plaintiff also agreed that the timing of SLCC's attempted distribution was appropriate. (<u>Id.</u> at page 208). In response to the instant motion, plaintiff does not refute this testimony. As stated above, 29 U.S.C. § 1132(a)(1)(B) limits a plaintiff's recovery to benefits due under the relevant plan. <u>Kerr</u>, 184 F.3d at 943. Here, plaintiff has admitted that the benefits he is entitled to receive under the Deferred Compensation Plan total $59,067.79. Having considered the arguments of the parties in light of the record, the undersigned concludes that SLCC has established its right to judgment as a matter of law on Count I that plaintiff is entitled to benefits in the amount of $59,067.79.

2.  <u>Count II</u>

In Count II, plaintiff seeks to recover against SLCC for benefits under the Employment Agreement Plan. In support of the instant motion, SLCC argues that it acted reasonably in determining that the amount owed to plaintiff was the amount in the Fidelity EAP account on the date that the distributions began, and that plaintiff is entitled to receive the benefits from that account. In response, plaintiff contends that SLCC should have been aware that his Employment Agreement Plan account had been mishandled from the outset, and that SLCC commingled funds from the Employment Agreement Plan and the Deferred Compensation Plan and failed to maintain a bookkeeping reserve. Plaintiff strenuously asserts that, by the terms of the Employment Agreement Plan, the balance of the Fidelity EAP account is insufficient and he is entitled to a "prudent investment amount." (Docket No. 192 at 7). For the following reasons, SLCC is entitled to judgment in its favor on Count II.

The parties agree that benefits determinations of administrators of top hat plans are reviewed under a <u>de novo</u> standard. <u>Craig v. Pillsbury Non-Qualified Pension Plan</u>, 458 F.3d 748, 752 (8th Cir. 2006). Observing that the policy considerations relied upon in <u>Firestone Tire & Rubber Co. v. Bruch</u> were absent in top hat plans, the <u>Craig</u> Court held that top hat plans should be treated as unilateral contracts and reviewed in accordance with ordinary contract principles. <u>Craig</u>, 458 F.3d at 752. The <u>Craig</u> Court held a plan's grant of discretion must be given effect as

ordinary contract principles would require, which meant that a party granted discretion must exercise it in good faith, "a requirement that includes the duty to exercise the discretion reasonably." Id. (internal citations omitted). The Craig Court concluded that, ultimately, a reviewing court must determine whether the plan's decision was reasonable. Id.

In the case at bar, the Employment Agreement Plan required SLCC to credit a portion of plaintiff's salary to a bookkeeping reserve account, and provided that SLCC would invest the funds at its discretion, determine how investments were reflected, decide whether to fund its obligations under the plan, and determine how to distribute benefits. (A.R. 0001-0004). The Employment Agreement Plan further provided that SLCC would credit the account with each item of gain and charge the account with each item of loss. (A.R. 0002). Although the Employment Agreement Plan did not consistently use the term "discretion," its language did confer upon SLCC sole responsibility for the administration of the Employment Agreement Plan. The undersigned determines that the plan indeed granted SLCC administrative discretion. See Kennedy v. Georgia-Pacific Corp., 31 F.3d 606, 609 (8th Cir. 1994). Thus, at the summary judgment stage, the issue is whether a reasonable factfinder[5] could determine that SLCC's actions were reasonable. If the answer is yes, SLCC is entitled to summary judgment in its

---

[5]ERISA confers no right to jury trial, so the Court would be the factfinder in the event of trial. See Houghton v. SIPCO, Inc., 38 F.3d 953, 957 (8th Cir. 1994).

favor on Count II.

The parties agree that SLCC opened an account at A.G. Edwards at plaintiff's request to hold the Employment Agreement Plan funds, and that plaintiff requested that the account be managed by broker William Simpson. Plaintiff does not dispute that the monthly contributions were made. The parties agree that plaintiff was routinely provided account statements. The parties agree that SLCC transferred the A.G. Edwards account to Fidelity Investments in 2005. The parties agree that SLCC subsequently attempted to distribute those funds to plaintiff. As SLCC argues, there is no dispute that the Fidelity accounts contain all of the assets to which plaintiff could be entitled.

Plaintiff contends that SLCC mishandled and wrongfully commingled funds between the Fidelity accounts, and complains that he took a substantial salary reduction in order to build a substantial nest egg and is therefore entitled to receive the "prudent investment" value of his salary deferrals. (Docket No. 192 at 6-7). The crux of plaintiff's argument appears to be that SLCC should have employed some other investment strategy. However, Count II is a claim for benefits, and plaintiff's recovery is limited to benefits due under the relevant plan. 29 U.S.C. § 1132(a)(1)(B). Despite plaintiff's contentions that the account balance should be higher, plaintiff is not entitled to receive an amount greater than the benefits that are available under the plan. Kerr, 184 F.3d 938, 943 (8th Cir. 1999) (the plaintiff was not entitled to receive an amount greater than the plan benefits even

though he had to wait three years and ultimately file a lawsuit to recover them).

As SLCC submits, the "sole issue before the Court is whether [SLCC] acted reasonably in determining that the amounts owed to Plaintiff were the amounts in the accounts on the date that the distributions began." (Docket No. 184 at 26). The undersigned resolves that issue in the affirmative, and concludes that SLCC acted reasonably in determining that the amounts owed to plaintiff were the amounts in the Fidelity accounts on the date that the distributions began. SLCC is therefore entitled to judgment in its favor on Count II.

C.    Counts III through VI

All of plaintiff's claims in Counts III through VI rely upon assertions of breach of fiduciary duty. Defendants argue that they are entitled to judgment as a matter of law on these claims because both plans are top hat plans, and are therefore exempt from ERISA's fiduciary responsibility requirements. In response, while plaintiff agrees that top hat plans are "specifically exempt from ERISA's provisions on participation and vesting, funding, and fiduciary responsibility," plaintiff argues that defendants "are not entitled to summary judgment of [sic] Counts III-VI because the plans at issue are not top hat plans." (Docket No. 163 at 5). Plaintiff offers no other argument in support of his claims in Counts III through VI. Review of the procedural history of this case reveals that leave to amend has been granted numerous times, and plaintiff has had sufficient opportunity to properly frame his

claims against defendants.

Top hat plans, like the Employment Agreement Plan and the Deferred Compensation Plan, while subject to the civil enforcement provisions of ERISA, are exempted from ERISA's fiduciary responsibility provisions. See 29 U.S.C. § 1101(a)(1); Craig v. Pillsbury Non-Qualified Pension Plan, 458 F.3d 748, 752 (8th Cir. 2006); see also Demery v. Extebank Deferred Compensation Plan (B), 216 F.3d 283, 286-87 (2nd Cir. 2000); Simpson, 187 Fed.Appx. at 484; In re New Valley Corp., 89 F.3d at 148. ERISA's civil enforcement provisions afford plaintiff his sole remedies for recovery of benefits due, or for enforcement of the terms of the Employment Agreement Plan and the Deferred Compensation Plan. See 29 U.S.C. § 1132(a)(1)(B); Great-West Life & Annuity Ins. Co. v. Knudson, 534 U.S. 204, 209 (2002) (expressing reluctance to afford remedies not specifically authorized by the text of ERISA).

Because plaintiff's claims in Counts III through VI rely upon assertions of breach of fiduciary duty, they fail as a matter of law. Defendants are entitled to summary judgment in their favor on plaintiff's claims in Counts III through VI. See Paneccasio v. Unisource Worldwide, Inc., 532 F.3d 101, 108 (2nd Cir. 2008) (citing Demery, 216 F.3d at 290) ("to the extent Paneccasio's ERISA claim relies on an assertion of breach of fiduciary duty, it was properly dismissed").

D.   Count VII

In Count VII, plaintiff alleges that SLCC and defendants Snowden, Lilly and Wells interfered with his ERISA-protected

rights, inasmuch as they retaliated against him when he asserted his ERISA rights by constructively discharging him from his position at SLCC.

As both parties recognize, to make a _prima_ _facie_ case of ERISA retaliation, a plaintiff must demonstrate that he participated in statutorily protected activity; that an adverse employment action was taken against him; and a causal relationship between the two. Rath v. Selection Research, Inc., 978 F.2d 1087, 1090 (8th Cir. 1992) (internal citation omitted). "The requisite causal connection may be proved circumstantially by proof that the discharge followed the protected activity so closely in time as to justify an inference of retaliatory motive." Id. "If plaintiff makes out a _prima_ _facie_ case of retaliation, the employer must articulate a legitimate, nondiscriminatory reason for its actions. If the employer meets that burden, plaintiff must prove that the proffered reason is pretextual." Id.

In support of the instant motion, defendants argue that they are entitled to judgment as a matter of law because plaintiff cannot establish that an adverse employment action was taken against him. Citing cases in which claims of constructive discharge were dismissed based upon various facts, defendants ask this Court to conclude that plaintiff was not constructively discharged, but resigned voluntarily. In response, plaintiff contends that his employment conditions were intolerable, citing various facts in support, including learning in May of 2004 that the balance of the A.G. Edwards account was extremely low, and that

SLCC knew of this fact.  Plaintiff also alleges that SLCC failed to properly credit amounts to a bookkeeping reserve, and responded to his inquiries in a dilatory fashion.  In reply, defendants contend that the facts plaintiff relies upon are incorrect or inadequate to support a claim of constructive discharge, arguing that, while plaintiff maintains that he did not learn of the low account balance until May of 2004, he admitted that he received statements on that account over the course of his tenure as General Manager. Defendants further contend that, even if the facts plaintiff alleges were true, they do not amount to a deliberately-created intolerable work environment.  Defendants also set forth facts in support of the conclusion that plaintiff's resignation was entirely at his own volition, including the text of plaintiff's resignation letter.  In response, while plaintiff does not dispute the language in the letter, he does dispute that the letter reflected the true nature of his working conditions. Defendants also suggest that the real reason plaintiff resigned was because he wanted to pursue a claim against SLCC and felt unable to work there simultaneously, which plaintiff disputes.

Defendants are entitled to summary judgment in their favor on Count VII.  Plaintiff admitted that he resigned from SLCC. As defendants argue, the text of plaintiff's resignation letter contains nothing to indicate that plaintiff's resignation was involuntary or that he considered his working environment intolerable.  In fact, plaintiff wrote that he was "grateful to be in a position to enjoy whatever life will throw [his] way," and he

expressed his thanks for the "respect and cooperation" he had received from the Board and Committee members over the years and for the confidence shown in him when he was appointed General Manager. (Docket No. 145, Attachment 4, page 2). Plaintiff testified that he decided that he needed to file suit against SLCC, that he needed to do so before the expiration of the statute of limitations, and that he did not want to work for SLCC afterwards. (Docket No. 145, Attachment 2, page 214, paragraphs 2-25). Finally, plaintiff testified that, after he tendered his resignation, the then-president of SLCC, Fred Hanser, invited him to continue his employment with SLCC and that plaintiff "could have definitely taken him up on it, you know, if I wanted to." (Docket No. 145, Attachment 2, page 226-227). As defendants argue, plaintiff has failed to demonstrate that an adverse employment action was taken against him and has therefore failed to make a prima facie claim of ERISA retaliation. See Rath, 978 F.2d at 1090. Defendants are entitled to summary judgment in their favor on plaintiff's claims in Count VII.

E.   Count VIII

In Count VIII, plaintiff alleges that SLCC failed to provide requested plan documents pertaining to the Deferred Compensation Plan and the Employment Agreement Plan; namely, summary plan descriptions, top hat filings, Form 5500s, and bookkeeping reserve account entries. Defendants argue that they are entitled to judgment as a matter of law because SLCC satisfied the minimal reporting and disclosure requirements for top hat plans

when it filed a top hat registration statement for both plans with the Department of Labor on August 23, 2007.

In response, while plaintiff acknowledges that ERISA and the Secretary's regulations establish alternative reporting requirements for top hat plans, he contends that a genuine issue of fact exists regarding whether the plans are top hat plans. Plaintiff alternately contends that SLCC's failure to timely file a top hat registration statement subjects SLCC to ERISA's reporting and disclosure requirements, but cites no legal authority in support. Plaintiff also states: "[t]he fact that the club did not even file a top-hat registration until after Plaintiff resigned and was therefore entitled to compensation from his Employment Agreement Plan has caused harm to Plaintiff." (Docket No. 163 at 11). Plaintiff alleges no facts in support of this statement.

A "top hat plan is deemed to have satisfied the reporting and disclosure requirements of ERISA, including the furnishing of a summary plan description and annual reports to plan beneficiaries, by filing a short statement with the Secretary of Labor and providing plan documents to the Secretary upon request." Demery, 216 F.3d at 291 (citing 29 C.F.R. § 2520.104-23(b)(prescribing alternative method of compliance); 29 U.S.C. § 1030 (authorizing Secretary to promulgate alternative methods of compliance for qualifying plans, including top hat plans)). Such statement is to be filed within 120 days of the date the plan became subject to ERISA. 29 C.F.R. § 2520.104-23(b)(2).

SLCC filed a top hat registration statement for both plans on August 23, 2007. (A.R. 67-68). Although not filed within 120 days of the date either plan became subject to ERISA, SLCC's top hat registration statement satisfies 29 C.F.R. § 2520.104-23(b) and therefore satisfies ERISA's reporting and disclosure requirements. Plaintiff's responsive pleading includes the conclusory statement that SLCC's late filing caused him harm. However, plaintiff alleges no facts in support of this statement. In the absence of any evidence of prejudice to plaintiff, the undersigned determines that no genuine issues of material fact exist, and defendants are entitled to judgment as a matter of law on plaintiff's claims in Count VIII. See Demery, 216 F.3d at 291 (employer's failure to timely file registration statement for deferred compensation plan with Department of Labor did not preclude plans' top hat status, absent evidence of prejudice to participants, and district court therefore properly declined to impose the penalties provided in 29 U.S.C. § 1132(c)).

Therefore, for all of the foregoing reasons,

**IT IS HEREBY ORDERED** that Defendants' Motion For Summary Judgment (Docket No. 143) is granted as provided herein.

_Frederick R. Buckles_

UNITED STATES MAGISTRATE JUDGE

Dated this 27th day of November, 2013.